**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

             Plaintiff,

      -v-                              1:21-CV-352 (AJB/MJK)

HUNTER-TANNERSVILLE
CENTRAL SCHOOL DISTRICT,

             Defendant.

**Hon. Anthony Brindisi, U.S. District Judge:**

## DECISION and ORDER

### I.    INTRODUCTION

On March 26, 2021, the United States Equal Employment Opportunity Commission (the "EEOC") filed this action against Hunter-Tannersville Central School District (the "District") to enforce certain provisions of the Equal Pay Act of 1963 (the "EPA").  Dkt. No. 1.

The EEOC's one-count complaint alleges that the District violated § 206(d)(1) of the EPA by paying former District superintendent, Dr. Susan T. Vickers ("Vickers"), less than her male predecessors and successors, despite performing substantially equal work.  Dkt. No. 1.

Presently before the Court are both parties' motions for summary judgment, Dkt. Nos. 118, 120, the District's motion to preclude the expert report and testimony of Dr. Hannah Riley-Bowles, Dkt. No. 117, and the EEOC's motion to preclude the expert report and testimony of Charles S. Amodio, Dkt. No. 119.

The motions have been fully briefed, Dkt. Nos. 125–30, 133–34, and will be considered on the basis of the submissions without oral argument.

## II.    BACKGROUND

Pursuant to Local Rule 56.1, the following facts are drawn from the parties' statements of material facts and the attached exhibits and are undisputed unless otherwise noted.

The District is a K–12 public school district in Greene County, New York.  Dkt. No. 118-2 ("District SMF") ¶ 2.  At any given time, the District has approximately 350 students.  *Id.* ¶ 3.  The District's Board of Education (the "Board") appoints a Superintendent of Schools (the "Superintendent") who acts as "the unitary leader of [the District]."  Dkt. No. 120-2 ("EEOC SMF") ¶¶ 8, 18.

The District's fiscal year runs from July 1st to June 30th and, per the District's Policy Manual, the Board may appoint a Superintendent to a term of 3 to 5 years.  *Id.* ¶ 2; Dkt. No. 120-3 ("Brown Decl."), Exh. 3 ("District Manual") at 4.  The Board "is the final decisionmaker on the pay and benefits the Superintendent receives."  EEOC SMF ¶ 7.

Policy 3100 of the District Manual "provides a general description of the duties and responsibilities of the District's Superintendent of Schools."  EEOC SMF ¶ 45.  It provides, in relevant part, that the Superintendent:

> attends all meetings of the Board[,] . . . participates in all of its deliberations[,] . . . advises the Board in policy development and general planning[,] . . . assumes initiative in presenting associated issues[,] . . . [and] provides data and information to the Board concerning progress and problems of the district.

District Manual at 4.

Relatedly, Policy 3120 of the District Manual "'sets forth the specific powers and duties of the . . . Superintendent.'"  EEOC SMF ¶ 46 (quoting District Manual at 5).  Policy 3120 organizes the Superintendent's powers and duties into the following categories: Relationship with the Board, Educational Direction and Leadership, Personnel, Financial Management,

Facilities Management, Community Relations, Personal Qualities and Growth, and Management Functions.  District Manual at 5–8.

Policies 3100 and 3120 apply to all who serve as the Superintendent and have been in effect since at least April 18, 2007.  EEOC SMF ¶¶ 47–57.  Further, since at least 2001, all of the District's Superintendents have possessed the powers and performed the duties set forth in New York State Education Law § 1711.  *Id.* ¶¶ 39–41.

From 2001 until 2006, Ralph Marino Jr. ("Marino") was the Superintendent.  District SMF ¶ 14.  Then, from 2007[1] to 2016, Dr. Patrick Darfler-Sweeney ("Sweeney") served as Superintendent.  *Id.* ¶ 15.  In July 2016, Vickers replaced Sweeney, serving as Superintendent until her retirement on June 30, 2020.  EEOC SMF ¶ 27.  Then, from 2020 to 2023, Nathan Jones was the Superintendent.   District SMF ¶¶ 9, 17.  Since December 1, 2023, Dr. Vincent Butera ("Butera") has been the Superintendent.  EEOC SMF ¶ 34.  Aside from Vickers, all of the District's Superintendents have been male.  *Id.* ¶ 31.

### A.  Marino

In June 2001, the Board selected Marino, then a building principal in the District, to serve as Superintendent starting that August.  EEOC SMF ¶ 187; District SMF ¶¶ 19–20.  At the time, Marino had fewer than 12 years of experience working in education, and he did not hold a doctorate degree.  EEOC SMF ¶¶ 188–89.

Under Marino's initial three-year contract, the Board agreed to pay him a salary of $92,540 for his service as Superintendent from August 1, 2001, to June 30, 2002.  EEOC SMF ¶ 192.  Although the parties dispute the amount of Marino's starting salary, they do not dispute that it would be greater than Vickers' starting salary of $125,000 when adjusted for inflation in

---

[1] James Piscitelli served as interim Superintendent during the 2006–2007 school year while the District conducted its search for a new Superintendent.  District SMF ¶ 18.

2016.  Dkt. No. 129-1 ("EEOC Resp. to District SMF") ¶ 105.  The Board agreed to raise

Marino's salary 4%, annually, through the 2003–2004 school year.  Brown Decl., Exh. 11, Dkt.

No. 120-14 at 2; EEOC SMF ¶¶ 203, 205.  Marino's initial contract also provided for annual

benefits, including 20 vacation days; 20 sick days, with the ability to accumulate up to 210 sick

days, including those carried over from his time as principal; 4 personal days; and termination

for just cause only.  Brown Decl., Exh. 11, Dkt. No. 120-14 at 2–3.  Additionally, the Board

agreed that the District would pay 95% of Marino's annual premium costs for individual health

insurance coverage, or 85% for family health insurance coverage.  *Id.*

Consistent with the terms of his initial contract, the Board paid Marino a salary of

$96,148 for the 2002–2003 school year and $99,994 for the 2003–2004 school year.  EEOC SMF

¶¶ 203, 205.  For the 2004–2005 school year,[2] the Board paid Marino a salary of $102,994.  *Id.*

¶ 207.  That year, the District also paid $1,750 into a tax-sheltered annuity on Marino's behalf.

*Id.* ¶ 208.

In 2005, Marino entered a new five-year agreement with the Board (the "2005

Agreement").  *See* Brown Decl., Exh. 12, Dkt. No. 120-15.  The Board agreed to pay Marino a

salary of $106,084, for the 2005–2006 school year, with an annual salary increase of 3% in each

successive year.  *Id.* at 3.  The 2005 Agreement modified existing benefits and added new

benefits, including a tax-sheltered annuity program; annual longevity payments, to begin in the

2006–2007 school year; and use of a District-issued cell phone, laptop, and pager for

professional and personal use.  *Id.* at 3–8.  The Board also agreed to contribute $2,000 towards

Marino's annual premium on a life insurance policy and $1,500 towards his annual premium

costs on a disability insurance policy.  *Id.*

---

[2] Neither party submitted a contract for this school year.

In July 2006, the Board agreed to amend Marino's contract a final time.  Brown Decl., Exh. 13, Dkt. No. 120-16.  Among other changes, the 2006 amendments provided that Marino could "cash in up to ten unused vacation days at a rate of 1/240 of his then-current salary." EEOC SMF ¶ 221.

In September 2006, Marino resigned.  District SMF ¶ 104.  Up until his resignation, the District made annual contributions to the New York State Teacher's Retirement System (the "NYSTRS") on his behalf, but the parties dispute the amounts of those contributions.  Dkt. No. 128-1 ("District Resp. to EEOC SMF") ¶¶ 201, 204, 206.

### B.  Sweeney

During the 2006–2007 school year, the Otsego Northern Catskills Board of Cooperative Educational Services ("ONC BOCES") and its superintendent, Dr. Marie Wiles ("Wiles"), assisted the Board with its search for the next Superintendent.  EEOC SMF ¶ 222.  Wiles had conversations with her colleagues regarding superintendent salaries in similarly sized districts with similar geographic makeups.  Dkt. No. 118-3 ("Quesnel Aff."), Exh. E ("Wiles Dep.") at 63–65.  She proposed a salary range of $115,000–$125,000 for the Superintendent role, *id.* at 133–34, but the Board decided to advertise a salary range of $110,000–$125,000 instead. District SMF ¶ 25; *see also* Quesnel Aff., Exh. M, Dkt. No. 118-16 ("Wilson Dep.") at 63–72 (explaining that the Board chose a starting point of $110,000 based on a superintendent salary of $108,150 at a comparably sized district).

After a multi-stage interview process, the Board hired Sweeney to serve as Superintendent for the 2007–2008 school year.  Wilson Dep. at 34–35.  Sweeney had 24 years of experience in education, including experience as a teacher and a principal.  *Id.* at 76–77. Sweeney had a master's degree and was enrolled in a doctoral program.  *Id.* at 76–77.  Although

other candidates for the role had already obtained a doctorate degree, the Board did not indicate a strong preference for a candidate with a terminal degree at that time. *Id.* at 76–79; Wiles Dep. at 147.  The Board selected Sweeney, in part, because he had experience working on building projects, and the District was in the beginning phases of a major building project at the time. Wilson Dep. at 74–78.

In April 2007, Wiles submitted the Board's initial contract proposal to Sweeney.  Wiles Dep. at 180–81.  The proposal offered Sweeney a $110,000 salary for the 2007–2008 school year and various benefits, including, *inter alia*: 20 vacation days, with the ability to defer 10 days for up to 12 months; payment for unused vacation days upon separation; 15 sick days, cumulative up to 200 days; reimbursement of relocation expenses up to $4,000; life insurance; disability insurance; and a District-issued phone, home computer, and fax machine. *Id.*; Brown Decl., Exh. 17, Dkt. No. 120-20 at 7, 9, 11, 13.  Although the Board decided what the starting salary offer would be, Wiles relied on an ONC BOCES template for the rest of the proposed benefits.  Wiles Dep. at 180–81; Wilson Dep. at 86.

An attorney from the New York State Council of School Superintendents ("NYSCOSS") represented Sweeney during the negotiations of his initial contract with the Board.  Quesnel Aff., Exh. B, Dkt. No. 118-5 ("Sweeney 30(b)(6) Dep. I") at 30.  Sweeney's attorney countered the Board's initial offer and requested a $10,000 salary increase, additional vacation days, increased Board contributions to Sweeney's annual insurance premium costs, reimbursement for all relocation expenses, and an annual reimbursement for Sweeney's education-related costs up to $2,000.  Wiles Dep. at 191–98.

After brief negotiations, Sweeney entered into a three-year agreement with the Board in May 2007.  Brown Decl., Exh. 21, Dkt. 120-24.  The Board rejected Sweeney's salary

counterproposal, and agreed to pay him $110,000 for the 2007–2008 school year. *Id.* at 4. The parties do not dispute that, when adjusted for inflation, Sweeney's starting salary was higher than Vicker's starting salary of $125,000 in 2016. District SMF ¶ 119. The Board also agreed to modify the initially proposed benefits to grant Sweeney 25 vacation days, 20 sick days, reimbursement up to $2,250 of costs associated with successfully completed doctoral classes, and reimbursement up to $5,400 for relocation expenses. Brown Decl., Exh. 21, Dkt. No. 120-24 at 4–7.

In his first year as Superintendent, Sweeney provided a high level of guidance and mentorship to the District's elementary school principal, Melinda McCool ("McCool"), who was in her second year with the District. Quesnel Aff., Exh. C, Dkt. No. 118-6 ("Sweeney 30(b)(6) Dep. II") at 45–46. Initially, Sweeney spent up to an hour and a half with McCool each day. *Id.* at 46. As McCool progressed, Sweeney spent less time providing direct guidance and began checking in with her periodically. *Id.* That year, Sweeney also oversaw the hiring of new middle and high school principal Simon Williams ("Williams"). *Id.* at 47. According to Sweeney, he spent the same amount of time working with Williams during the 2007–2008 school year as he did with McCool. *Id.* at 48.

In May 2008, the District's treasurer left, and the Board promoted Marianne Romito ("Romito") to the position. Sweeney 30(b)(6) Dep. II at 36. Romito was inexperienced and did not have an advanced degree or any business certifications when she was appointed. *Id.* at 35. Sweeney worked closely with Romito daily and provided substantial support and guidance for 5 to 10 hours each week through 2010. *Id.* at 37–38. Sweeney hired Greg Beall, of the ONC BOCES central business office, to help with training and coordination between the District office and the ONC BOCES central business office. *Id.*

At the end of Sweeney's first school year as Superintendent, the Board agreed to amend Sweeney's initial contract. Brown Decl., Exh. 22, Dkt. No. 120-25. The amendments raised Sweeney's salary by 4%, to $114,400, for the 2008–2009 school year; increased the Board's annual reimbursement for Sweeney's doctoral program costs to $3,000; and required the Board to deposit $5,000, annually, into a "Doctoral Reimbursement/Retirement Savings Account" that would be turned over to Sweeney after 10 years of service with the District. *Id.* at 2–3.

When Sweeney was hired, the District was in the early stages of an $8.3 million capital improvement project. Sweeney 30(b)(6) Dep. II at 59. Some aspects of the project were completed before Sweeney arrived, but the majority of the construction occurred between the summer of 2008 and January 2010. *Id.* at 62–65. During that time, Sweeney spent at least an hour with the construction managers each day. *Id.* at 65. He was "constantly" in the construction managers' on-site office, and he met with them regularly at construction sites, where he was required to wear a hard hat. *Id.* at 65–66. Sweeney also met with Board leadership bi-weekly to provide updates on the project. *Id.*

Throughout 2008 and 2009, Sweeney oversaw the discipline and removal of tenured teacher and athletic director, Randy Mudge ("Mudge"). Dkt. No. 128-2 ("Quesnel Resp. Aff."), Exh. P, Dkt. No. 128-18 ("Sweeney Dep.") at 98–99; *see also* Wilson Dep. at 137. The incident was widely covered by local media outlets. Sweeney 30(b)(6) Dep. II at 21, 75–76. Sweeney had previously worked as an athletic director, so he directly mentored Mudge's replacement. *Id.* at 21.

Near the end of his second year with the District, Sweeney requested additional changes to his contract in May 2009. Brown Decl., Exh. 23, Dkt. No. 120-26. The Board agreed to extend Sweeney's contract through the 2013–2014 school year; raise his salary by 3.5%, to $118,404, for the 2009–2010 school year and implement a 3.5% annual salary raise in each

successive year; reimburse 100% of Sweeney's doctoral program tuition costs,[3] which amounted to $57,500 in total; and modify the existing "Doctoral Reimbursement/Retirement Savings Account" provision to allow Sweeney to receive the funds in the account if the Board decided to terminate Sweeney's employment prior to the completion of 10 years of service.  Brown Decl., Exh. 24, Dkt. No. 120-27 at 2–3.

From 2010–2011, various weather emergencies impacted the District, including a snowstorm, Hurricane Irene, and Tropical Storm Lee.  Sweeney Dep. at 100–01.  Sweeney facilitated the opening of a Red Cross emergency shelter at the District's elementary school following the snowstorm, and he oversaw storm mitigation efforts in the wake of Hurricane Irene and Tropical Storm Lee.  Sweeney 30(b)(6) Dep. II at 14, 26, 67.

Consistent with the 2009 amendments, the Board paid Sweeney a salary of $122,548 for the 2010–2011 school year and $126,837.18 for the 2011–2012 school year.  EEOC SMF ¶¶ 355, 367.

In September 2011, after four years with the District, the Board agreed to amend Sweeney's contract for a third time.  Brown Decl., Exh. 28, Dkt. No. 120-31.  The 2011 amendments extended Sweeney's contract through the 2014–2015 school year and provided health insurance coverage for Sweeney and his spouse upon Sweeney's retirement.  *Id.* Specifically, "the District agreed to pay 100% of Sweeney's individual health insurance premiums and 35% of his dependent health insurance premiums from the date of his retirement from the District until his death."  EEOC SMF ¶ 362.

---

[3] In May 2010, Sweeney received his doctorate degree.  EEOC SMF ¶ 336.

Consistent with Sweeney's contract, the Board raised his salary by 3.5% annually through the 2013–2014 school year—paying Sweeney $131,276.48 for the 2012–2013 school year and $135,871 for the 2013–2014 school year.  EEOC SMF ¶¶ 370, 373.

In March 2013, the Board agreed to amend Sweeney's contract for the last time.  Quesnel Aff., Exh. ZZ, Dkt. No. 118-55.  The March 2013 amendments extended Sweeney's contract through the 2015–2016 school year; raised Sweeney's salary to $143,789 for the 2015–2016 school year; and eliminated the relocation cost reimbursement provision.  *Id.* at 2–4.

In September 2013, the District's Director of Special Education left, and Sweeney took over the duties of that position.  EEOC SMF ¶ 157.  Those duties included:

> a) helping the Committee on Special Education Chair with the direction of Special Education, b) assessing how many Special Education teachers and aides were needed and asking other people to assist with that, c) hiring new Committee on Special Education Chairs, d) mentoring the CSE Chair, and e) constructing IDEA 611 and 619 grants (which is determining where the money would be used and where it would be spent).

*Id.*  Sweeney performed those duties for the remainder of his tenure with the district.  *Id.* ¶ 161.

In June 2014, the District's facilities director resigned, and Sweeney took over those duties for seven weeks.  Sweeney 30(b)(6) Dep. II at 93–94.  During that time, Sweeney (1) coordinated staffing around vacations to ensure that the facilities were being maintained; (2) coordinated summer facilities projects related to cleaning and supplies; and (3) interviewed individuals for facilities positions.  *Id.* at 95.

Throughout Sweeney's superintendency, he supervised technological upgrades within the District including the installation of LCD projectors and smart boards in classrooms, the purchase of Chromebooks for students, and the introduction of Google Classroom.  Sweeney 30(b)(6) Dep. II at 21, 85–86.

Sweeney retired at the end of the 2015–2016 school year. Up until that point, the Board made annual contributions to the NYSTRS on Sweeney's behalf, but the parties dispute the amounts of those contributions. District Resp. to EEOC SMF ¶¶ 309, 330, 353, 356, 369, 372, 374, 376, 379.

Even though Sweeney retired short of serving 10 years with the District, the Board decided to pay him the proceeds of his retirement account, totaling approximately $45,136, anyway. Quesnel Aff., Exh. J, Dkt. No. 118-13 ("Thorpe Dep.") at 175–76; EEOC SMF ¶¶ 383, 386. The Board also paid Sweeney $15,686.16 for 24 unused vacation days. Sweeney 30(b)(6) Dep. I at 184–85. Since Sweeney's retirement, the District has paid his annual health insurance premiums. EEOC SMF ¶ 391.

## C. Vickers

During the 2015–2016 school year, the Board conducted a search for a new Superintendent with assistance from the superintendent of ONC BOCES, Nicolas Savin ("Savin"). EEOC SMF ¶ 392. In early 2015, Sweeney advocated for McCool to serve as the next Superintendent, *see* Sweeney Dep. at 196, and the Board was aware of her interest and potential candidacy when it initiated its search. Thorpe Dep. at 89–90.

In early 2016, "[t]he Board selected a salary range of $120,000 to $140,000." EEOC SMF ¶ 406; Thorpe Dep. at 89. According to Board member Eric Thorpe ("Thorpe"), the Board established a salary range below Sweeney's ending salary because "the school district ha[d] gotten smaller in students," and the Board felt that Sweeney's salary "might have been a little too high." Thorpe Dep. at 81.

After a multi-stage interview process, the Board selected Vickers as its next Superintendent. District SMF ¶ 66. Vickers "had approximately [26] years of prior employment in public schools in various capacities." EEOC SMF ¶ 410. She was a social studies teacher for

nearly fifteen years, serving as department leader for five of those years. *Id.* ¶ 411. After that, Vickers worked as an administrator for twelve years, "holding roles . . . as an Assistant Principal and then [an] Associate Principal at two separate high schools." *Id.* ¶ 412. Vickers also obtained a doctorate of education degree in executive leadership and completed a superintendent development program. *Id.* ¶ 414.

In March 2016, Savin sent Vickers an initial contract proposal on the Board's behalf. District SMF ¶ 71; EEOC SMF ¶ 82. The draft was developed before the Board selected Vickers. Thorpe Dep. at 107. The Board decided on a starting salary offer of $120,000 for the 2016–2017 school year, but the remainder of the proposed benefits were supplied by ONC BOCES templates. Quesnel Aff., Exh. G, Dkt. No. 118-10 ("Savin Dep.") at 177–78.

The benefits proposed in the draft sent to Vickers differed from those offered to Sweeney at the time he was hired. Thorpe Dep. at 103–110, 117–121. Under the terms of Vickers' draft contract, she could not sell back or carry forward any unused vacation days; she did not receive a temporary bank of sick days; she could accumulate only 180 sick days; she would not be reimbursed for relocation expenses; and the Board could terminate her employment at any time without cause. Brown Decl., Exh. 36, Dkt. No. 120-39 at 4–9. Vickers' draft contract also provided that, after five years of service, the District would cover half of Vickers' annual premium costs for individual health insurance coverage in retirement. *Id.*

During the initial contract negotiations, Vickers was represented by NYSCOSS attorney Jacinda Conboy ("Conboy"). Quesnel Aff., Exh. A, Dkt. No. 118-4 ("Vickers Dep.") at 159. Conboy is also a woman. Quesnel Aff., Exh. F, Dkt. No. 118-9 ("Conboy Dep.") at 152. Conboy countered the Board's initial offer and requested a $5,000 salary increase; the ability to sell 5 unused vacation days back to the Board, annually and to carry forward 5 unused vacation

days into the next year; removal of the no-fault termination provision; and reimbursement for her moving expenses.  Brown Decl., Exh. 37, Dkt. No. 120-40 at 2.

Following negotiations, Vickers entered into a three-year agreement with the Board in April 2016.  Brown Decl., Exh. 40, Dkt. No. 120-43.  The Board agreed to pay Vickers a salary of $125,000 for the 2016–2017 school year.  *Id.* at 3.  The Board rejected Vickers' counterproposal with respect to vacation days; modified the no-fault termination provision so that it applied in Vickers' first year only; and agreed to reimburse Vickers for up to $2,500 of relocation expenses.  *Id.* at 3–6.  Unlike Sweeney's initial contract, Vickers' contract did not include provisions relating to disability insurance, life insurance, or District-provided electronics.  *Id.*; Thorpe Dep. at 103–110, 117–121.

In Vickers' first year as Superintendent, she oversaw the hiring of two new principals.  EEOC SMF ¶ 14.  Neither had held a school principal position before.  *Id.*  It is undisputed that Vickers provided mentorship to the District's new elementary school principal, Nate Jones ("Jones"), *id.* ¶ 145, but the parties dispute whether and to what extent Vickers mentored the newly hired middle and high school principal, Tom Cervola.  District Resp. to EEOC SMF ¶ 145.  The parties also dispute whether and to what extent Vickers provided guidance to Kayla Hughes ("Hughes"), the District's treasurer, who had been on the job for approximately one year when Vickers was hired.  Sweeney 30(b)(6) Dep. II at 34 ("Q . . . did [Vickers'] duties include providing guidance and support to the District's treasurer? A. Um, not really, because I had hired Kayla just previous, so she wouldn't have a need to do that."); Brown Decl., Exh. 5, Dkt. No. 120-8 ("Abrahamsen Decl.") ¶ 7 ("I observed Vickers providing significant guidance to Hughes in her role, meeting with her frequently.").

Because Sweeney had served as the director of special education up until his retirement, *see* Sweeney 30(b)(6) Dep. II at 12–13, the District did not have a director of special education when Vickers started.  EEOC SMF ¶ 161.  From the beginning of her tenure, Vickers performed various functions related to the special education department including: (1) presenting at department meetings, (2) determining staffing needs, (3) coordinating the hiring process for the Committee on Special Education ("CSE") chair, (4) preparing the department budget, and (5) signing off on IDEA Section 611 and 619 grants.  *Id.* ¶¶ 162–166.  According to Sweeney, Vickers did not assume the directorship role, as he had, and these duties were performed in her capacity as Superintendent.  Sweeney 30(b)(6) Dep. II at 12–13, District Resp. to EEOC SMF ¶¶ 162–66.

In February 2017, the Board agreed to amend Vickers' contract.  Thorpe Dep. at 135.  The amendments extended Vickers' contract through the 2019–2020 school year; increased her salary by 3%, to $128,750, for the 2017–2018 school year; implemented a 3% annual raise in subsequent years; and modified an existing provision to allow Vickers to receive health insurance in retirement after 4 years of service, with reduced District contribution amounts.  Brown Decl., Exh. 45, Dkt. No. 120-48 at 3–5.

During the 2017–2018 school year, the District hired Liz Rizzo ("Rizzo") to replace outgoing District clerk, Denice Abrahamsen ("Abrahamsen").  Vickers Dep. at 313.  Vickers testified that she provided extensive guidance to Rizzo in her new role.  *Id.* at 313–14.

The Board agreed to amend Vickers' contract again in the fall of 2018.  Brown Decl., Exh. 48, Dkt. No. 120-51.  The amended agreement extended Vickers' term through the 2020–2021 school year; lowered her annual salary raise to 2% for the 2020–2021 school year[4]; and

---

[4] According to Vickers, she requested a 2% raise because of upcoming teachers' contract negotiations and the need to rein in spending.  Vickers Dep. at 183.

increased the District's annual contribution to Vickers' health insurance premium costs in retirement by 5%.  *Id.* at 2–4.

In 2019, the District hired Ryan Funck ("Funck") to serve as the new middle and high school principal.  EEOC SMF ¶ 146.  Funck "had never . . .  been a school principal before being hired into this role."  *Id.*  "Vickers mentored and developed Funck as a new [p]rincipal," *id.* ¶ 147, and according to Vickers, Funck required extensive guidance.  Vickers Dep. at 313.

The Board agreed to amend Vickers' contract for the final time in 2019.  Brown Decl., Exh. 49, Dkt. No. 120-52.  This amendment provided that, once Vickers retired and reached the age of 65, she would be enrolled in the CASEBP Medigap plan and the CASEBP Dental plan, and the District would pay a percentage of her annual premium costs under those plans consistent with her existing agreement.  *Id.*

Throughout Vickers' tenure, she oversaw technological upgrades within the District.  EEOC SMF ¶ 150.  The upgrades included "replacing the District's electronic reading assessment program, approximately 55 desktop computers a year, and the District's computer server," and updating the District's security cameras.  *Id.* ¶ 152.  Vickers also supervised a redesign of the District's website, and the implemented "a new electronic student management system."  *Id.* ¶ 154.  According to Board member John Aizstrauts ("Aizstrauts"), though, any technological upgrades Vickers oversaw were minor or incidental to those Sweeney had previously implemented.  Quesnel Aff., Exh. K, Dkt. No. 118-14 ("Aizstrauts Dep.") at 84–86.

In each year of her superintendency, Vickers oversaw capital improvement projects, including the replacement of "two boilers in the District, the District's Technical Building Services Control Systems (which controlled the District's HVAC system), [the] replace[ment] of stage rigging, stage lighting and controls, with associated piping and wiring, and [the]

reconstruct[ion] [of] various school district buildings."  EEOC SMF ¶ 118.  According to Sweeney, these "smaller" capital projects, having a combined budget of around $850,000, were continuing in nature and required less work than the major capital project he oversaw during his tenure.  Sweeney 30(b)(6) Dep. II at 67–70.

Although Vickers did not supervise the construction phases of a multimillion-dollar capital project while she was Superintendent, she was involved in the development of a $6 million capital project, which required her to meet with architects and develop a funding plan. Vickers Dep. at 279–82; Sweeney 30(b)(6) Dep. II at 72–73.

At some point during Vickers' tenure, a non-tenured teacher resigned during the school year, and Vickers taught social studies classes for a few weeks, until a long-term substitute was hired.  Vickers Dep. at 287–89.  Vickers was also involved in the discipline of a tenured teacher who had consumed alcohol in the classroom, but that teacher was not terminated.  *Id.* at 291–92. Additionally, Vickers oversaw the termination of a non-tenured staff member while serving as Superintendent.  *Id.*

In the fall of 2019, Vickers announced her plan to retire after the 2019–2020 school year. Vickers Dep. at 196–97.  Months later, in the spring of Vickers' final year, the COVID-19 pandemic spread across the country.  *Id.* at 213.  In response, Vickers coordinated the District's transition to remote learning, communicated the District's plans to parents, responded to media inquiries, ensured compliance with changing state regulations, prepared the District for a 20% cut in state funding, and provided weekly updates to the Board.  *Id.* at 213, 262–63.

In May 2020, Vickers asked then-president of the Board, Andrea Benjamin-Legg ("Benjamin-Legg"), and then-vice president, Aizstrauts, if the Board would consider compensating her for unused vacation days upon her retirement.  Brown Decl., Exh. 54, Dkt. No.

- 16 -

120-57 at 2 & Exh. 106, Dkt. No. 120-109 ("Benjamin-Legg Dep. I") at 75–77; *see also* Aizstrauts Dep. at 144–45.  Vickers stated that she had hoped to utilize 6 to 10 vacation days that school year, but her plans were disrupted by the increased workload brought on by the COVID-19 pandemic.  Brown Decl., Exh. 54, Dkt. No. 120-57 at 2.

At that time, Benjamin-Legg was on the Board's "negotiations committee."  EEOC SMF ¶ 525.  According to Benjamin-Legg, the negotiations committee reviews proposed contracts and amendments, meets with legal counsel, and provides feedback to the Board on contract negotiations.  Quesnel Aff., Exh. I, Dkt. No. 118-12 ("Benjamin-Legg Dep. II") at 8–9.

At the May 2020 Board meeting, the Board discussed Vickers' request to sell back unused vacation days, but postponed all decision-making until June.  Aizstrauts Dep. at 151–52.  After the May meeting, Aizstrauts e-mailed Benjamin-Legg, outlining reasons why the Board should grant Vickers' request, including that (1) COVID-19-related state mandates prevented Vickers from utilizing her vacation days during the 2019–2020 school year; (2) Sweeney's contract allowed him to sell back unused vacation days to the District; and (3) Jones, who had been selected earlier that year to replace Vickers as Superintendent, was also allowed to sell back unused vacation days under his contract.  *Id.* at 152–56.  Aizstrauts also expressed concern over the risk of litigation due to appearance of discrimination that could arise if the Board denied Vickers' request given that she is female, and both Sweeney and Jones are male.  *Id.* at 154–55.

At the June Board meeting, Aizstrauts laid out his arguments in favor of granting Vickers' request to sell back unused vacation days, and he reiterated his concern regarding a potential lawsuit, but the Board denied Vickers' request anyway.  Aizstrauts Dep. at 162; Brown Decl., Exh. 56, Dkt. No. 120-59 at 4.

"On August 10, 2020, Vickers filed a charge of discrimination with the EEOC, in which she alleged: that the District violated the EPA because she 'was denied buy back vacation days and [she] was not given bonuses'; the District paid her male predecessor, [Sweeney], and male successor, [Jones] for their unused vacation days and 'bonuses.'"  District SMF ¶ 10.  The District opposed Vickers' charge.  Quesnel Aff., Exh. U, Dkt. No. 118-24.  According to the complaint, the EEOC investigated Vickers' charge and determined that it was meritorious in January 2021.  Dkt. No. 1 ("Compl.").

### D. Jones

Jones was the District's elementary school principal from 2016 until mid-2020.  Quesnel Aff., Exh. O, Dkt. No. 118-18 ("Jones Dep.") at 55.  Prior to that, he worked as an elementary school physical education teacher in the District for 9 years.  Benjamin-Legg Dep. I at 42; *see also* Jones Dep. at 42.  Jones is married to Board president Benjamin-Legg's niece.  Benjamin-Legg Dep. I at 49.

In early November 2019, Jones met with the Board to discuss the possibility of him replacing Vickers as Superintendent beginning in the 2020–2021 school year.  Jones Dep. at 67–69.  At the time, Jones had 13 years of experience working in education.  Benjamin-Legg Dep. I at 42.  He did not hold a doctoral degree, and he had not yet obtained the state certification required to serve as Superintendent.  Jones Dep. at 38–39, 65.  After the November 2019 Board meeting and conversations with District stakeholders, the Board selected Jones as Vickers' successor.  Benjamin-Legg Dep. I at 48, 50–51.

Benjamin-Legg and Aizstrauts met with Savin at ONC BOCES to develop an initial contract draft for Jones.  Benjamin-Legg Dep. I at 48, 50–51.  Savin assembled a preliminary contract draft using a template.  Savin Dep. at 205–08.  The Board provided input on what salary and benefits to include in the draft.  Benjamin-Legg Dep. I at 53.

- 18 -

In March 2020, Jones entered a three-year employment contract with the Board (the "2020 Agreement"). Brown Decl., Exh. 53, Dkt. No. 120-56. The Board agreed to pay Jones a salary of $115,000 for the 2020–2021 school year. *Id.* at 4. The 2020 Agreement also provided for annual benefits, including: 20 vacation days, with the ability to sell back 5 unused vacation days, with Board approval; 20 sick days, cumulative to 210 days, with the ability to carry over 70 days from his employment with the District; compensation for unused sick days at the time of separation; annual longevity payments starting at $1,250 after 5 years of service as Superintendent; termination for cause only; use of a District-issued cellphone; possible reimbursement for costs associated with enrollment in a doctoral program; and, upon Jones' retirement, the District would pay 90% of his annual health insurance premium costs for individual coverage, or 25% for family coverage. *Id.* at 4–9.

The benefits in the 2020 Agreement reflected those in the Board's initial proposal to Jones,[5] *see* Brown Decl., Exh. 51, Dkt. No. 120-54, and he had not requested "any particular salary or benefits as Superintendent before receiving the initial contract proposal from the District on January 21, 2020." EEOC SMF ¶ 494. The Board never offered Vickers payment for accrued, unused sick days upon separation; longevity payments; the option to sell back unused vacation days; or use of a District-issued cellphone. *Id.*; *see also* Aizstrauts Dep. at 133–43.

In his first year as Superintendent, Jones was tasked with reopening the District following the COVID-19 pandemic lockdown. Jones Dep. at 19–20. Jones attended New York State Department of Health ("NYSDOH") meetings and created a reopening plan that complied with NYSDOH guidance. *Id.* at 27–29.

---

[5] The Board's initial offer only permitted Jones to accumulate 180 sick days, but it is unclear whether he negotiated for the increase to 210 days. Benjamin-Legg Dep. I at 74.

In June 2021, construction started on the $6 million capital project developed by Vickers. Jones Dep. at 26–27.  Jones supervised the construction phase of the project.  Jones Dep. at 23–24.

The Board agreed to amend Jones' initial contract in February 2022.  Jones Dep. at 93; Brown Decl., Exh. 58, Dkt. No. 120-61.  The amended agreement established a new four-year employment period for Jones, running from July 1, 2022, to June 30, 2026.  *Id.* at 2.  The Board also raised Jones' salary to $119,600, a 4% increase, retroactively for the 2021–2022 school year.  *Id.*; Jones Dep. at 98.

In May 2022, the Board agreed to amend Jones' contract again.  Jones Dep. at 109–110; Brown Decl., Exh. 59, Dkt. No. 120-62.  That amendment provided that, starting in the 2022–2023 school year, Jones would receive an annual salary raise of 2.5% plus the Consumer Price Index factor percentage increase for the region, not to exceed a total raise of 5% from the previous year's salary; and, absent any pressing work demands, Jones would be allowed to take the holiday break off.  *Id.* at 2–3.  The May 2022 amendment also removed the provision that allowed Jones to sell back 5 unused vacation days annually.  *Id.* at 3.

For the 2022–2023 school year, Jones received an annual salary of $125,580, a 5% increase from the year prior.  Brown Decl., Exh. 71, Dkt. No. 120-74 at 4.

While serving as Superintendent, Jones developed a $13 million capital improvement project.  Jones Dep. at 29–31.  Jones testified that development of the project required "substantial work."  *Id.* at 29.

In May 2023, Jones notified the Board of his intent to resign on July 10, 2023.  Jones Dep. at 118–19.  Up until his resignation, the Board made annual contributions to the NYSTRS on his behalf.  EEOC SMF ¶¶ 523, 531, 543.

At the June 2023 Board meeting, Jones finalized his resignation and amended his contract with the Board a final time.  Brown Decl., Exh. 60, Dkt. No. 120-63.  The June 2023 memorandum of agreement provided that the Board would accept Jones' resignation, effective June 30, 2023; the Board would pay Jones $7,500 in consideration for the earlier resignation date; and Jones could remain on the District's health insurance plan until July 9, 2023.  *Id.* at 2.  The Board paid Jones $58,794.46 for his unused sick days upon separation.  EEOC SMF ¶ 550.

### E.  Butera

Following Jones' resignation, the District distributed a brochure to advertise its search for a new Superintendent.  Benjamin-Legg Dep. II at 77–79.  The brochure directed prospective candidates to submit application materials to ONC BOCES superintendent Dr. Catherine Huber ("Huber"), who assisted the Board with its search.  Brown Decl., Exh. 63, Dkt. No. 120-66 at 4.  The brochure advertised a salary range of $130,000–$140,000 and an anticipated start date of October 1, 2023.  *Id.*  The Board determined the salary range based on Huber's recommendation and the median salary of other superintendents in the area.  Benjamin-Legg Dep. II at 79.

In Fall 2023, the Board selected Butera to replace Jones as Superintendent.  Benjamin-Legg Dep. II at 38.  Butera had obtained his doctorate degree and had approximately 20 years of experience, including prior experience as a superintendent.  EEOC SMF ¶ 557; Benajmin-Legg Dep. II at 90–91; Quesnel Aff., Exh. N, Dkt. No. 118-17 ("Butera Dep.") at 22.

In November 2023, Butera entered a three-year employment agreement with the Board (the "2023 Agreement").  Brown Decl., Exh. 66, Dkt. No. 120-69.  Under the 2023 Agreement, the Board agreed to pay Butera a salary of $160,000 for the 2023–2024 school year, prorated to reflect Butera's December 1, 2023, start date.  *Id.* at 4.  The 2023 Agreement granted Butera a range of annual benefits, including: 20 vacation days, with the ability to carryover unused vacation days to the next year and the option to sell back 5 unused vacation days, with Board

approval; 12 days of sick leave for the 2023–2024 school year and 20 sick days in each subsequent year, cumulative to 210 days; payment for unused sick days upon separation; 3 days of personal leave; reimburse for relocation expenses up to $5,000; termination for cause only; use of a District-issued cellphone and home computer; and health insurance upon retirement after 8 years of service with the District.  *Id.* at 4–9.

Unlike Butera, Vickers was never offered payment for accrued, unused sick days upon separation; personal days, in addition to sick leave; the option to sell back unused vacation days, or use of a District-issued cellphone and home computer.  *Id.*; *see also* Aizstrauts Dep. at 133–43.

In April 2025, the Board agreed to add a provision to Butera's contract that required it to reimburse Butera for $8,000 of housing expenses, annually.  Brown Decl., Exh. 67, Dkt. No. 120-70 at 2.  The amendment applied retroactively from July 1, 2024.  *Id.*

## III.    DISCUSSION

The EEOC asserts an EPA claim against the District on behalf of the charging party, Vickers.  Compl.  The parties have cross-moved for summary judgment.  Dkt. Nos. 118, 120. Each party has also moved to preclude one of the other's expert witnesses.  Dkt. Nos. 117, 120.

### A.    Summary Judgment

The District has moved for summary judgment on the EEOC's EPA claim, arguing that there is insufficient evidence to establish an EPA violation and, regardless, that it has established its affirmative defense as a matter of law.  Dkt. No. 118-1 ("District Mem.").  The EEOC has cross-moved for summary judgment, arguing that it has set forth sufficient evidence to establish a *prima facie* EPA violation, and the District has not met its burden on its affirmative defense. Dkt. No. 120-1 ("EEOC Mem.") at 4–5.

### 1. Legal Standard

The entry of summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In conducting this analysis, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Id.* at 255. Even so, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Cross-motions for summary judgment do not alter this standard, but simply require the court to determine whether either party is entitled to judgment as a matter of law on facts that are not in dispute. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000)). "[A] district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

### 2. Evidentiary Issues

The EEOC objects to several assertions contained in the District's statement of material facts on the ground that the District "cannot use its own unsworn, frequently erroneous interrogatory response to support any statement of fact in this matter." EEOC Resp. to District SMF ¶ 5.

Federal Rule of Civil Procedure ("Rule") 56 provides that "[a] party asserting that a fact cannot be or is genuinely disputed" may support that assertion by "citing to . . . interrogatory answers." Fed. R. Civ. P. 56(c)(1)(A). Interrogatories must be answered and signed by "the party to whom they are directed," or by a designated officer or agent of the party, where the "party is a public or private corporation, a partnership, an association, or a governmental agency . . ." Fed. R. Civ. P. 33(b).

Some courts have suggested that a party's attorney of record may not respond to interrogatories. *See Trueman v. N.Y. State Canal Corp.*, 2010 WL 681341, at *5 (N.D.N.Y. Feb. 24, 2010) ("Frankly, there is no distinction between an attorney signing the interrogatory answers or the attorney providing the response in a separate document; both are improper under the Federal Rules."); *Shire Labs., Inc. v. Barr Labs., Inc.*, 236 F.R.D. 225, 227 (S.D.N.Y. 2006) ("Rule 33(a) provides that a corporation may answer interrogatories 'by any officer or agent.' 'Agent' includes an **outside** attorney for the corporation." (quoting Fed. R. Civ. P. 33(a)) (emphasis in original).

Here, the District's interrogatories are signed only by the District's counsel of record, Scott Quesnel, Esq. ("Mr. Quesnel"). *See* Dkt. Nos. 118-19, 118-20.[6] Even assuming, as other courts have, that a party's "attorney is permitted to sign an interrogatory response on [an entity]'s behalf as an 'officer or agent,'. . . the attorney must [still] verify that[,] to the best of his knowledge, the answers are true and contain all information which is available to the [entity]." *Jacob v. City of New York*, 2009 WL 383752, at *2 (E.D.N.Y. Feb. 6, 2009) (citing *Shire Labs.*,

---

[6] The District has not designated Mr. Quesnel to testify on its behalf, *see* Brown Decl., Exh. 89, Dkt. No. 120-92, and several of the interrogatory responses he provided conflict with the testimony of the District's designated 30 (b)(6) witnesses. *See* EEOC Resp. to District SMF ¶ 103; District Resp. to EEOC SMF ¶¶ 206, 209, 309, 330, 353, 369, 372, 379.

*Inc.*, 236 F.R.D. at 228).  Indeed, Rule 33 explicitly provides that "each interrogatory must . . . be answered separately and fully in writing *under oath*."  Fed. R. Civ. P. 33(b)(3) (emphasis added).

Consequently, a party may not rely on its own unsworn, unverified interrogatory responses to support or oppose a motion for summary judgment.  *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968) (holding unverified answers to interrogatories inadmissible in opposition to summary judgment motion); *Tr. of the 1199SEIU Nat. Ben. Fund v. LaMaze*, 2011 WL 4389442, at *2–3 (S.D.N.Y. Sept. 20, 2011) (excluding unsworn interrogatory responses on summary judgment); *Chen v. Shanghai Cafe Deluxe, Inc.*, 2019 WL 1447082, at *10 (S.D.N.Y. Mar. 8, 2019) ("Where interrogatory responses are not verified, as required by Rule 33(b)(3) of the Federal Rules of Civil Procedure, they cannot be relied upon."); *Cavanagh v. Ford Motor Co.*, 2017 WL 2805057, at *7 (E.D.N.Y. June 9, 2017), *report and recommendation adopted*, 2017 WL 2804934 (E.D.N.Y. June 28, 2017) ("Neither unverified answers to interrogatories nor a complaint that plaintiff has not sworn to can constitute admissible evidence.").

Here, the District repeatedly relies on unsworn, unverified interrogatory responses in support of its motion for summary judgment and in opposition to the EEOC's motion for summary judgment.  *See* Dkt. Nos. 118-19, 118-20.  Accordingly, any factual assertions that are premised on those responses and otherwise unsupported by the record will be disregarded.

Even so, the EEOC maintains that the District's unsworn interrogatory responses are admissible *against* the District as admissions of a party opponent.  EEOC Resp. to District SMF ¶ 5.

Under Rule 33, "[a]n answer to an interrogatory may be used to the extent allowed by the Federal Rules of Evidence."  Fed. R. Civ. P. 33.  Second Circuit precedent indicates that

unsworn interrogatory responses prepared by a party's attorney may be admissible against that party as an admission of a party opponent under Federal Rule of Evidence 801(d)(2).  *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("'[S]tatements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney.'" (quoting *United States v. McKeon*, 739 F.2d 26, 30 (2d Cir. 1984)); *see also Miroglio S.P.A. v. Conway Stores, Inc.*, 2008 WL 4600984, at *7 (S.D.N.Y. Oct. 15, 2008) (holding party's unsworn interrogatory responses admissible only as opposing party statements).

Accordingly, the District's unsworn interrogatory responses may be relied upon by the EEOC as admissions of a party opponent.

### 3.  Equal Pay Act

In 1963, Congress passed the EPA "to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work."  *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999).  "To prove discrimination under the Equal Pay Act, a plaintiff must show that: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.'"  *Lavin-McEleney v. Marist College*, 239 F.3d 476, 480 (2d Cir. 2001) (quoting *Belfi*, 191 F.3d at 135).

"[U]nlike Title VII, the EPA does not require a plaintiff to establish an employer's discriminatory intent."  *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000).  Instead:

> [o]nce a plaintiff makes out a *prima facie* case under the EPA, the burden of persuasion shifts to the defendant to show that the wage disparity is justified by one of the affirmative defenses provided under the Act: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."

*Belfi*, 191 F.3d at 136 (quoting 29 U.S.C. § 206(d)(1)).

If "the employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, 'the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination.'" *Ryduchowski*, 203 F.3d at 142 (quoting *Belfi,* 191 F.3d at 136).

### i. Preliminary Matters

Although the parties have identified at least four potential comparators—Marino, Sweeney, Jones, and Butera, *see* EEOC SMF ¶¶ 21–23, 26, 32–35; *see also* District SMF ¶¶ 14–15, 17, the EEOC focuses its analysis on Sweeney. EEOC Mem. at 24–26. The District argues that this amounts to improper "cherry-picking." Dkt. No. 128 ("District Opp.") at 18–19; *see also* District Mem. at 21–23.

In *Lavin-McEleney v. Marist College*, the Second Circuit discussed the Fourth Circuit rule that requires EPA plaintiffs to "'identify a particular male 'comparator' for purposes of the inquiry.'" 239 F.3d at 480 (quoting *Strag v. Bd. of Trs.*, 55 F.3d 943, 948 (4th Cir. 1995). In that case, the Second Circuit "express[ed] no opinion on the merits of [the Fourth Circuit's] rule," because the plaintiff in *Lavin-McEleney* had identified a specific male comparator. *Lavin-McEleney*, 239 F.3d at 480. Even so, the court articulated concern over the implications of such a rule, noting that:

> The problem with comparing plaintiff's pay only to that of a single male employee is that it may create the impression of an Equal Pay Act violation where no widespread gender discrimination exists.

*Id.* at 481.

Because both parties have asserted facts and submitted evidence concerning four possible comparators, the Court will consider plaintiff's claim in light of all of them.

### ii. The EEOC's *prima facie* case

The EEOC contends that it has established its *prima facie* case against the District. EEOC Mem. at 23–26.  The District disagrees.  District Opp. at 10–13.

"To establish a *prima facie* case . . . under [the EPA], [a] plaintiff must show that '[1] the employer pays different wages to employees of the opposite sex; [2] the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and [3] the jobs are performed under similar working conditions.'"  *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 258 (2d Cir. 2024) (quoting *Belfi*, 191 F.3d at 135 (citing 29 U.S.C. § 206(d)(1))).

### a.  Different Wages

First, the EEOC must establish that the District paid different wages to employees of the opposite sex.  *Belfi*, 191 F.3d at 135 (citing 29 U.S.C. § 206(d)(1)).  "Under the EPA, the term 'wages' generally includes all payments made to [or on behalf of] an employee as remuneration for employment."  29 C.F.R. § 1620.10.  Specifically, the term "wages" includes:

> [A]ll forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment.

*Id.*

Here, the record evidence establishes wage disparities between Vickers and her four potential comparators.  Although the parties dispute the exact value of Marino's starting salary after adjusting for inflation, there is no dispute that it would be greater than Vickers' starting salary of $125,000 in 2016.  EEOC Resp. to District SMF ¶ 105.  The same is true of Sweeney's starting salary.  District SMF ¶ 119.

Further, it is undisputed that Marino, Sweeney, Jones, and Butera, were initially offered benefits—*e.g.*, compensation for unused vacation and sick days, annuity/longevity payments, use of a District-issued phone and computer, life insurance, and disability insurance—that Vickers

was not.  *See* District Resp. to EEOC SMF ¶¶ 212, 247–48, 255–56, 382, 420, 426, 429–31, 502, 574, 578, 580; Thorpe Dep. at 103–110, 117–121; Aizstrauts Dep. at 133–43.  And, although the Board offered to reimburse Vickers, Butera, and Sweeney for moving expenses, it agreed to pay Vickers half of what it agreed to pay Butera and Sweeney.  *See* District Resp. to EEOC SMF ¶¶ 259, 291–92, 440–41, 576–77.

In sum, the undisputed evidence demonstrates the existence of a wage differential between Vickers and her male comparators.

### b.  Equal Work

Next, the EEOC must establish that Vickers and her male comparators performed "equal work on jobs the performance of which require equal skill, effort, and responsibility."  *Belfi*, 191 F.3d at 135 (quoting 29 U.S.C. § 206(d)(1)).  The EEOC contends that Vickers and Sweeney "held the same job," and thus performed equal work.  EEOC Mem. at 24–25.  In opposition, the District argues that the EEOC has not established that Vickers and any of the identified male comparators performed equal work.  District Opp. at 10–13.

"While the equal work inquiry does not demand evidence that a plaintiff's job is 'identical' to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'"  *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (quoting *Lavin-McEleney*, 239 F.3d at 480).  For instance, "[a] violation . . . may be proven if the 'skill, effort, and responsibility' required in the performance of the jobs is 'substantially equal.'"  *Usery v. Columbia U.*, 568 F.2d 953, 958 (2d Cir. 1977) (citations omitted).  Ultimately, "[w]hether two positions are 'substantially equivalent' for Equal Pay Act purposes is a question for the jury."  *Lavin-McEleney*, 239 F.3d at 480.

It is undisputed Vickers and her male comparators held the same job title, possessed the same statutory powers, and, per the District's manual, were responsible for the same duties. EEOC SMF ¶¶ 39–41.

But "a successful EPA claim depends on the comparison of actual job content; broad generalizations drawn from job titles, classifications, or divisions . . . cannot suffice." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d at 256. "The focus of the equal work inquiry is 'on the congruity and equality of actual job content between the plaintiff and comparator.'" *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 691 (2d Cir. 2017) (quoting *id.* at 255) (summary order).

There are several disputes as to the congruity of the actual job content between Vickers and her male comparators. *See* District Resp. to EEOC SMF at pp. 259–261 (citing Sweeney 30(b)(6) Dep. II at 21, 34 60, 62–67, 72–73, 75–76, 93–95).

For example, the parties dispute whether Vickers and her comparators had to perform equal work on capital projects. District Resp. to EEOC SMF ¶¶ 116–17. The Board hired Sweeney, in part, due to his experience overseeing building projects. Wilson Dep. at 74–78. Sweeney testified that he oversaw the construction stages of a large capital project during the first few years of his tenure, which required him to wear a hard hat and report to the building site daily. Sweeney 30(b)(6) Dep. II at 62–66. Jones, too, supervised the construction phases of a multimillion-dollar capital project. Jones Dep. at 23–27.

On the other hand, Vickers oversaw three smaller capital projects, with a combined budget of under $1 million during her tenure. Sweeney 30(b)(6) Dep. II at 70. According to Sweeney, Vickers supervised "continuing projects" that "were spread out over time." *Id.* at 70–71. The parties dispute whether Vickers' smaller projects required the same effort and skill as

the larger projects supervised by Sweeney and Jones. District Resp. to EEOC SMF ¶¶ 116–17; EEOC Resp. to District SMF ¶ 100.

Additionally, the parties dispute whether Vickers and Jones performed equal work on capital project developments. Although both Vickers and Jones developed proposals for large capital projects, *see* Vickers Dep. at 279–82; Sweeney 30(b)(6) Dep. II at 72–73; Jones Dep. at 29–31, Vickers testified that she developed a $6 million project proposal, *see* Vickers Dep. at 279–82, whereas Jones developed a $13 million project proposal. Jones Dep. at 29–31.

Further, the parties dispute whether Vickers and Sweeney were required to perform equal work with regard to personnel disciplinary matters. District Resp. to EEOC SMF ¶ 124. Sweeney oversaw the widely publicized discipline and removal of tenured teacher and athletic director, Mudge. Sweeney Dep. at 98–99; Sweeney 30(b)(6) Dep. II at 21, 75–76; Wilson Dep. at 137. Afterwards, Sweeney had to provide guidance to Mudge's replacement. Sweeney 30(b)(6) Dep. II at 21. Although Vickers oversaw the termination of a non-tenured staff member, her discipline of a tenured staff-member did not result in a license suspension or removal and did not yield significant media attention. Vickers Dep. at 290–91.

Relatedly, the parties dispute whether Sweeney and Vickers dedicated comparable time and effort in mentoring and guiding new administrators and employees. EEOC Resp. to District SMF. ¶ 100. According to Sweeney, he mentored new staff members directly and Vickers, in many instances, sought out others to provide mentorship. Sweeney 30(b)(6) Dep. II at 34. Vickers disputes this, identifying various instances where she provided direct mentorship and guidance to new employees. Vickers Dep. at 313–14; *see also* Abrahamsen Decl. ¶ 7.

While some of these disputes may reflect a difference in the degree, rather than the kind, of work completed by Vickers and her comparators, the record still "gives each party sufficient

evidence to cite in seeking to persuade a fact-finder" that Vickers did or did not "perform[ ] equal to that of her more highly paid male [comparators]." *Husser v. New York City Dep't of Educ.*, 137 F. Supp. 3d 253, 269 (E.D.N.Y. 2015). "In such circumstances, it is clearly the fact-finder's role to assess such evidence and determine whether [the EEOC] has made a *prima facie* showing that [Vickers] and her [comparators] had comparable jobs for purposes of the Equal Pay Act[.]" *Id.*

In fact, courts routinely deny summary judgment on this issue. *See McCullough v. Xerox Corp.*, 224 F. Supp. 3d 193, 198–99 (W.D.N.Y. 2016) (denying summary judgment where evidence "narrowly suffice[d] to raise a question of fact as to whether their jobs all involved the same common core of tasks, and were therefore substantially equal for purposes of the EPA") (internal quotation marks omitted); *Zimpfer v. Hilbert Coll.*, 788 F. Supp. 3d 520, 538–39 (W.D.N.Y. 2025) (denying summary judgment where salient facts concerning substantial equivalence were in dispute); *Shieldkret v. Park Place Ent. Corp.*, 2002 WL 91621, at *4 (S.D.N.Y. Jan. 23, 2002) (denying summary judgment where the extent of overlapping duties was disputed); *see also Moazzaz v. MetLife, Inc.*, 2024 WL 1312995, at *5 (S.D.N.Y. Mar. 26, 2024) (denying summary judgment on EPA claims and noting that "[w]hether different positions are 'substantially equivalent' for the purposes of the Equal Pay Act is usually a question of fact to be resolved by a jury." (citing *Lavin-McEleney*, 239 F.3d at 480)), *on reconsideration in part sub nom. Moazzaz v. Met Life, Inc.*, 2024 WL 2330751 (S.D.N.Y. May 22, 2024).

Because there are disputes of fact regarding whether the work performed by Vickers and her male comparators required equal skill, effort, and responsibility, the Court denies both parties' motions as to the EEOC's *prima facie* case.

### c.  Willfulness

Because disputes of fact remain as to whether the EEOC has established a *prima facie* EPA violation, *see supra* Point III.A.3.ii.a–b, any determination on the willfulness of a potential violation would be premature.

### iii.  The District's affirmative defense

The District has moved for summary judgment on its affirmative defense, arguing that "[e]ven if [the EEOC] could establish a *prima facie* case, any differences between Vickers'[ ] wages and that of the District's other superintendents were attributable to a factor other than sex."  District Mem. at 24.  In opposition, the EEOC contends that the District "cannot establish that the pay differential . . . was caused by any affirmative defense to the [EPA]."  Dkt. No. 129 ("EEOC Opp.") at 21.

"Once a plaintiff makes out a *prima facie* case under the EPA, the burden of persuasion shifts to the defendant to show that the wage disparity is justified by" an enumerated exception. *Belfi*, 191 F.3d at 136.  The EPA sets forth exceptions "for pay disparities resulting from '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on *any other factor other than sex*.'" *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 515 (2d Cir. 2023) (quoting 29 U.S.C. § 206(d)(1)) (emphasis in original).  "Each exception operates as an affirmative defense." *Eisenhauer*, 84 F.4th at 515.

The District has invoked the fourth enumerated affirmative defense—*i.e.*, that the alleged wage disparities were caused by factors other than sex.  District Mem. at 28.

In *Eisenhauer*, the Second Circuit held that, "to establish the EPA's 'factor other than sex' defense, a defendant must prove that the pay disparity in question results from a differential

based on any factor except for sex." *Eisenhauer*, 84 F.4th at 518.  There, the court distinguished

its earlier decision in *Aldrich v. Randolph Central School District*, 963 F.2d 520 (2d Cir. 1992),

where a different three-judge panel held that a "facially sex-neutral job-classification system

alone is insufficient to constitute a 'factor other than sex'" and that "a *job*-relatedness

requirement is necessary to ensure that a *job*-classification system is not a pretext for sex

discrimination." *Eisenhauer*, 84 F.4th at 516 (emphasis in original).[7]

The District has identified various potential "factors other than sex" in support of its

defense, including (1) longevity; (2) pre-determined pay scales; and (3) individualized bona fide

contract negotiations.  District Mem. at 28–34.  The EEOC rejects all three proffered

explanations as invalid, unsupported by the evidence, or otherwise pretextual.  EEOC Opp. at

23–34.

First, the District argues that the disparity between Sweeney's ending salary and Vickers'

starting salary is justified by longevity because, by Sweeney's final year with the District, he had

9 years of experience as Superintendent, whereas Vickers had none when she started in 2016.

District Mem. at 29.

"[A]n employer may properly decide to pay higher salaries to employees with greater

experience, more advanced educational degrees, or objectively better credentials than their co-

workers." *Husser*, 137 F. Supp. 3d at 269.

---

[7] The EEOC cites the Second Circuit's decision in *Moll v. Telesector Resources Group, Inc.*, in support of its contention that a "factor other than sex" must be job-related.  EEOC Opp. at 26–27 n.19.  In *Moll*, the Second Circuit relied on the rule established in *Aldrich*, which applies only where an employer cites a sex-neutral job classification system as a "factor other than sex" to justify a pay disparity.  *See Aldrich*, 963 F.2d at 525 ("Congress intended for a job classification system to serve as a factor-other-than-sex defense to sex-based wage discrimination claims only when the employer proves that the job classification system resulting in differential pay is rooted in legitimate business-related differences . . ."); *see also Eisenhauer*, 84 F.4th at 517 ("We did not hold [in *Aldrich*] that all 'factor[s] other than sex' must be job related."); *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 42 n.4 (2d Cir. 2025) (citing *Eisenhauer*, 84 F.4th at 525).  The District does not cite a sex-neutral job classification system as a "factor other than sex" in support of its defense.  *See generally*, District Mem.

On one hand, longevity may explain the disparity between Sweeney's final salary and Vickers' starting salary, and the fact that the District paid Jones a lower starting salary than it paid Vickers further supports the District's contention that experience played a role in determining the Superintendent's starting salary.

On the other hand, experience does not justify the disparities between Vickers' starting salary and the starting salaries of Marino and Sweeney. Nor does it explain why certain benefits were offered to Sweeney, Jones, and Butera upon hiring, but not Vickers. Aside from Butera, Vickers had the most professional experience[8] and held the most advanced degree upon hiring, yet her starting salary was lower than Sweeney's and Marino's starting salaries, and she was denied benefits offered to Sweeney, Jones, and Marino.

Accordingly, these disputes of fact preclude summary judgment on the District's affirmative defense on this basis.

Next, the District contends that the pay disparity between Vickers and her comparators was a result of the District's advertised salary ranges for the Superintendent position. District Mem. at 30–31. The EEOC argues that the District's advertised salary ranges are irrelevant because they were not binding on the District. EEOC Opp. at 25.

The advertised pay scale for the Superintendent position was $110,000–$125,000 when Sweeney was hired, *see* District SMF ¶ 25, and $120,000–$140,000 when Vickers was hired, *see* EEOC SMF ¶ 406. The District argues that the pay scale justifies any wage disparity, because it was set *before* the Board determined that Sweeney's successor would be female. District Mem. at 30.

---

[8] Although Butera had less years of experience than Vickers, he had prior experience as a superintendent, which she did not. *See supra* Point II.E.

However, as the EEOC points out, *see* EEOC Opp. at 25, the record contains evidence suggesting that, when the Board set its salary range for Vickers' position, it was aware that McCool, who is also a woman, was a potential candidate to replace Sweeney as Superintendent. Thorpe Dep. at 89–90.

This dispute precludes summary judgment on the District's "factor other than sex" defense premised on advertised salary ranges.

Lastly, the District contends that the wage disparity was the result of "individualized, bona fide contract negotiations." District Mem. at 34–35. The EEOC argues that the District cannot rely on negotiations as a "factor other than sex" justifying the wage disparities because it is pretextual. EEOC Opp. at 26–27.

As the Second Circuit has explained, once "[an] employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Moll*, 94 F.4th at 258 (quoting *Ryduchowski*, 203 F.3d at 142) (internal quotation marks omitted).

The District submitted evidence that the Board utilizes a negotiation committee to negotiate contracts and contract amendments. Benjamin Legg Dep. II at 8–9. Board member Thorpe testified that the Board went into its 2016 Superintendent search with the goal of decreasing the Superintendent salary because the District had gotten smaller and the Board felt that Sweeney's salary "might have been a little too high," and the Board had been "a little too generous with [Sweeney's]" compensation. Thorpe Dep. at 81.

But, as the EEOC points out, when asked why the Board denied Vickers' initial counterproposal to sell back and carry forward unused vacation days, Thorpe responded "[n]ot

sure." Thorpe Dep. at 128. Further, it is undisputed that, prior to any negotiations, the Board offered Sweeney and Jones benefits that it did not offer to Vickers. EEOC SMF ¶¶ 246, 494, 508.

Because there is a dispute of fact as to whether negotiations were a pretext for sex discrimination, summary judgment must be denied.

### iv. Damages

Because issues of fact remain with respect to which, if any, of Vickers' predecessors and successors qualify as comparators, *see supra* Point III.A.3.ii.b, the Court declines to address the issue of damages at this stage.

### B. Motions to Preclude Expert Testimony

Along with their motions for summary judgment, each party has moved under Federal Rule of Evidence 702 to exclude the other's proffered expert testimony. *See* Dkt. Nos. 117-1, 119-1.

The Court finds that fact issues remain as to the EEOC's EPA claim and the District's affirmative defense based on the lay witness evidence. *See supra* Point III.A.3.

Where, as here, summary judgment relief is not warranted "irrespective of the admissibility of the parties['] experts," then "it is not necessary to reach the parties' *Daubert* motions at this juncture." *Henessey Food Consulting LLC v. Prinova Sols., LLC*, 2024 WL 4291312, at *16 (N.D.N.Y. Sept. 24, 2024) (collecting cases).

Accordingly, the motions to preclude expert testimony are denied without prejudice to be renewed *in limine* if necessary.

## IV.    CONCLUSION

Therefore, it is

ORDERED that

1.  The District's motion for summary judgment (Dkt. No. 118) is DENIED;

2.  The EEOC's motion for summary judgment (Dkt. No. 120) is DENIED;

3.  The District's motion to preclude Dr. Hannah Riley-Bowles (Dkt. No. 117) is

    DENIED, without prejudice to renewal;

4.  The EEOC's motion to preclude Charles Amodio (Dkt. No. 119) is DENIED, without

    prejudice to renewal; and

5.  Within 14 days, the parties shall file a joint status report addressing trial readiness and

    any other outstanding issues.

The Clerk of the Court is directed to:

    a.    Terminate the pending motions (Dkt. Nos. 117, 118, 119, 120).

**IT IS SO ORDERED.**

Dated:  February 23, 2026
        Utica, New York.

Anthony J. Brindisi
U.S. District Judge

- 38 -